IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 19- |
| | : | |
| v. | : | DATE FILED: |
| | : | |
| TIMOTHY F. SHAWL | : | VIOLATIONS: |
| | : | 21 U.S.C. § 841 (a)(1), (b)(1)(C) |
| | : | (distribution of controlled substance – |
| | : | 5 counts) |
| | : | Notice of forfeiture |

## INDICTMENT

## COUNTS ONE THROUGH FIVE

(Distribution of Controlled Substances)

**THE GRAND JURY CHARGES THAT:**

At all times material to this indictment:

1. Defendant TIMOTHY F. SHAWL was a medical doctor licensed by the Commonwealth of Pennsylvania under medical license number MD036539E. Defendant SHAWL practiced obstetrics and gynecology at an obstetrics and gynecology practice known as Feinstein, Patrick and Shawl, MD, Center City, Pennsylvania Hospital located at 829 Spruce Street, Suite 200, Philadelphia, PA.

2. The Controlled Substances Act ("CSA") governed the manufacturing, distributing, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

3. Medical practitioners, such as physicians, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were

registered with the Attorney General of the United States. 21 U.S.C. § 822(b); 21 C.F.R. § 1306.03. Upon application by the practitioner, the Drug Enforcement Administration ("DEA") assigned a unique registration number to each qualifying medical practitioner.

4. As part of his practice, defendant SHAWL prescribed controlled substances, including highly addictive opioids, under DEA License Number BS0802036.

5. The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

6. A controlled substance assigned to Schedule II meant that the drug had a high potential for abuse, was highly addictive, and that the drug had a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions. Abuse of a Schedule II controlled substance could lead to severe psychological and/or physical dependence. Pursuant to the CSA and its implementing regulations:

   a. Oxycodone was classified as a Schedule II controlled substance. Oxycodone was sold generically and under a variety of brand names, including OxyContin, Roxicodone, Endocet, and Percocet. Oxycodone, an opioid pain medication, is about fifty percent stronger than Morphine.

   b. Oxycodone was among the Schedule II opioid controlled substances that had the highest potential for abuse and associated risk of fatal overdose.

7. Chapter 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled

substance must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.

8. The Pennsylvania Code of Professional and Vocational Standards, Title 49, Chapter 16.92, defines the authority of physicians licensed in the Commonwealth of Pennsylvania to prescribe controlled substances. Chapter 16.92 provides, in pertinent part: A person licensed to practice medicine and surgery in this Commonwealth, or otherwise licensed or regulated by the Board, when prescribing, administering or dispensing controlled substances, shall carry out, or cause to be carried out, the following minimum standards:

   a. *Initial medical history and physical examination.* Before commencing treatment that involves prescribing, administering or dispensing a controlled substance, an initial medical history shall be taken and an initial examination shall be conducted unless emergency circumstances justify otherwise. Alternatively, medical history and physical examination information recorded by another health care provider may be considered if the medical history was taken and the physical examination was conducted within the immediately preceding thirty days. The physical examination shall include an evaluation of the heart, lungs, blood pressure and body functions that relate to the patient's specific complaint.

   b. *Reevaluations.* Among the factors to be considered in determining the number and the frequency of follow-up evaluations that should be recommended to the patient are the condition diagnosed, the controlled substance involved, expected results and possible side effects. For chronic conditions, periodic follow-up evaluations shall be recommended to monitor the effectiveness of the controlled substance in achieving the intended results.

   c. *Patient counseling.* Appropriate counseling shall be given to the patient regarding the condition diagnosed and the controlled substance prescribed, administered or

dispensed. Unless the patient is in an inpatient care setting, the patient shall be specifically counseled about dosage levels, instructions for use, frequency and duration of use and possible side effects.

    d.    *Medical Records.* Certain information shall be recorded in the patient's medical record on each occasion when a controlled substance is prescribed, administered or dispensed. This information shall include the name of the controlled substance, its strength, the quantity and the date it was prescribed, administered or dispensed to a patient. The medical record shall also include a specification of the symptoms observed and reported, the diagnosis of the condition for which the controlled substance is being given and the directions given to the patient for the use of the controlled substance. If the same controlled substance continues to be prescribed, administered or dispensed, the medical record shall reflect changes in the symptoms observed and reported, in the diagnosis of the condition for which the controlled substance is being given and in the directions given to the patient.

    9.    Defendant TIMOTHY F. SHAWL prescribed Schedule II controlled substances, including oxycodone, for his patients outside the usual course of professional practice and without a legitimate medical purpose. Specifically, defendant SHAWL:

    a.    prescribed Schedule-II controlled substances to patients with no medical examinations;

    b.    prescribed excessive amounts of controlled substances relative to the medical condition the prescription was allegedly treating;

    c.    prescribed controlled substances for an unreasonable period of time; and

    d.    failed to treat patients with anything other than controlled substances.

10. On or about each of the dates listed below, in Philadelphia, in the Eastern District of Pennsylvania, the defendant

**TIMOTHY F. SHAWL**

knowingly and intentionally distributed a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, as listed below, without a legitimate medical purpose and outside the usual course of professional practice, each of which constitutes a separate count of this Indictment:

| Count | Approximate Date of Distribution | Individual Receiving the Prescription | Controlled Substance |
|---|---|---|---|
| 1 | October 12, 2016 | Patient 1 | Oxycodone |
| 2 | March 2, 2018 | Patient 2 | OxyContin |
| 3 | January 4, 2019 | Patient 2 | OxyContin |
| 4 | May 15, 2019 | Patient 3 | Oxycodone |
| 5 | May 21, 2019 | Patient 4 | Oxycodone |

All in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C).

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

11. As a result of the violations of Title 21, United States Code, Section 841, set forth in this indictment, the defendant

**TIMOTHY F. SHAWL**

shall forfeit to the United States of America:

(a) any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violations; and

(b) any property constituting, or derived from, proceeds obtained, directly or indirectly, from the commission of such violations.

12. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 21, United States Code, Section 853.

GRAND JURY FOREPERSON

for WILLIAM M. MCSWAIN
United States Attorney
Eastern District of Pennsylvania

ROBERT ZINK
Chief
Criminal Division, Fraud Section